## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

NewMech Companies, Inc.,                                    Civil No. 04-4484 (DWF/SRN)

        Plaintiff,

v.                                                                                  **MEMORANDUM**
                                                                                        **OPINION AND ORDER**

Transportation Insurance Company,
an Illinois corporation,

and

Continental Casualty Company,
an Illinois corporation,

        Defendants.

---

Gerald S. Duffy, Esq., and M. Gregory Simpson, Esq., Siegel Brill Greupner Duffy & Foster, counsel for Plaintiff.

Matthew R. Wildermuth, Esq., Meckler Bulger & Tilson, LLP, Stacy A. Broman, Esq., Meagher & Geer, PLLP, counsel for Defendants Transportation Insurance Company and Continental Casualty Company; William D. Hull, Esq., Coleman Hull & Van Vliet, PLLP, counsel for Defendant St. Paul Reinsurance Company.

---

## Introduction

This declaratory judgment action came before the Court pursuant to a Motion for Summary Judgment brought by Plaintiff NewMech Companies, Inc. ("NewMech"). By the Amended Complaint (the "Complaint"), NewMech alleges three counts: (1) breach of contract; (2) bad faith refusal to settle; and (3) estoppel/waiver. For the reasons set forth below, the motion is denied.[1]

---

[1]      The Court is dismayed by Defendants' carelessness in citing the record. Defendants
(Footnote Continued on Next Page)

**Background**

This case involves disputes that arose out of the construction of the Stone Arch and Washburn Lofts condominium projects in Minneapolis, Minnesota.  NewMech is a mechanical contracting company based in St. Paul, Minnesota.  Defendant Transportation Insurance Company ("Transportation") is an insurance company that issued NewMech a Commercial General Liability policy (the "CGL Form") effective October 1, 2000, to October 1, 2001.  The CGL Form insures NewMech for its liability to others for occurrences of negligently-caused property damage.  The CGL Form limits are $1 million per occurrence and $2 million aggregate.  Additionally, the CGL Form covers the expense of defending covered claims.

The CGL Form also contains a "Design Services Liability Coverage Endorsement" (the "Design Services Endorsement"), which insures NewMech for liability to others for property damage caused by negligent design.  (Aff. of M. Gregory Simpson in Supp. of NewMech's Mot. for Summ. J. ("Simpson Aff."), Ex. 1. at 8–14.)  The Design Services Endorsement has its own limits of $1 million per "wrongful act" and $2 million aggregate.

---

(Footnote Continued From Previous Page)

failed to identify half of their exhibits, let alone indicate where such exhibits could be located in the record.  Moreover, Defendants cited to incorrect exhibits, failed to cite page numbers in lengthy exhibits, and cited page numbers in other exhibits but failed to file the corresponding pages.  All of this has unnecessarily increased the time required to decide the motion.  Reading this brief, the Court felt like it was on an archeology dig, sifting through the record in search of evidence to support the Defendants' arguments.  *Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662–63 (7th Cir. 1994) ("District judges are not archaeologists.").

(Footnote Continued on Next Page)

Additionally, Defendant Continental Casualty Company ("Continental") issued NewMech an umbrella insurance policy (the "Continental Policy") for the period October 1, 2000, to October 1, 2001.  The umbrella policy has a $20 million liability limit.

### The Stone Arch and Washburn Condominium Projects

Brighton Development Corporation ("Brighton") was the developer of the Stone Arch Lofts and the Washburn Lofts condominium projects.  Brighton and Kraus-Anderson Construction Company ("KA"), the general contractor, entered into separate contracts for the two projects.  KA subcontracted mechanical system responsibilities to NewMech.  Specifically, NewMech was responsible for designing and building the heating, ventilation, and air conditioning ("HVAC") systems for each project.

The Stone Arch project was completed first and by mid-summer 2001, individual unit owners occupied the Stone Arch building.  In late July and August 2001, high humidity conditions occurred in the Stone Arch building.  This resulted in condensation within the building that led to the formation of mold, damage to floors, woodwork, and drywall, and other property damage.  Some units were very severely damaged.

Brighton and KA engaged engineers and consultants to assess the problem.  The engineers and consultants identified NewMech's mechanical system as the possible cause of the high humidity conditions in the Stone Arch building.  Brighton demanded that KA repair the mechanical system and damage to the building, and compensate it for other

(Footnote Continued From Previous Page)

damages.  KA, in turn, demanded that NewMech indemnify it and perform alleged

obligations under its subcontract with regard to repairs and payment of damages.

In the fall of 2001 through early winter of 2002, the Stone Arch/Washburn Lofts

Condominium Association and individual unit owners demanded that Brighton, KA, and

NewMech compensate them for building repair and other damages.  Brighton, KA, and

NewMech entered into an agreement called the "Rework Agreement," and Brighton and KA

entered into an agreement called the "Agreement for Additional Work."  Pursuant to these

agreements, the parties agreed to repair the building, share certain costs and expenses, and

reserve all rights against one another.  The purpose of the agreements was to attempt to

satisfy claims by the condominium association and individual unit owners and to mitigate

the three parties' potential adverse consequences of leaving the building unrepaired.

Despite the parties' repair efforts, three condominium owners sued Brighton and KA

in 2002.  Brighton and KA settled the lawsuit.  Other unit owners and the condominium

association threatened to sue over the course of 2002.  Brighton and KA tried to either

satisfy claims that were made or reduce their exposure to claims by performing work or

making payments.

### *The Arbitration Proceedings*

In December 2002, pursuant to their original contract, Brighton initiated arbitration

proceedings against KA over the Stone Arch dispute.  Noting that KA had delegated its

duties to design and install an adequate HVAC system at Stone Arch to NewMech, Brighton

asserted that KA had breached its contract and duties of care "by negligently designing and

installing a defective mechanical system, by negligently misrepresenting the time needed for repairs and by negligently and improperly performing punchlist work and performing poor quality work that delayed completion of the Stone Arch Project and alienated condominium owners." (Simpson Aff., Ex. 3 at Ex. B.)  Brighton demanded more than $2 million in damages.  KA joined NewMech as a third-party respondent.  KA asserted that NewMech was responsible for indemnifying it to the extent that KA was found liable to Brighton with regard to the alleged defects and negligent performance of NewMech's work.

KA later initiated separate arbitration proceedings against Brighton and NewMech over the Washburn dispute.  KA alleged that Brighton failed to pay contract amounts due for work performed at Washburn.  KA asserted that NewMech was a necessary party because NewMech alleged that it was owed more than $1 million for its work at Washburn.  In its Answer, Brighton did not seek damages against NewMech.

NewMech's insurance agent notified Transportation of the humidity occurrence at Stone Arch on July 26, 2001.  NewMech's insurance agent tendered the Stone Arch demand for arbitration to Transportation by letter dated January 7, 2003.  By letter dated January 10, 2003, Transportation agreed to defend NewMech in the Stone Arch arbitration under a reservation of rights.  NewMech tendered the Washburn matter by letter dated March 30, 2004.  Transportation denied coverage for the Washburn claim by letter dated May 19, 2004.

The American Arbitration Association ("AAA") consolidated the two arbitrations and appointed three arbitrators to decide the case.  Beginning May 2004, the arbitrators heard

47 days of witness testimony during which 48 witnesses testified.  The arbitrators entered over 30,000 pages of exhibits into the record.  Inexplicably, no transcript or recording was made of the proceedings.[2]

At the arbitration, Brighton's claims against NewMech were based on allegations of negligence in the design and construction of the HVAC system at Stone Arch.  Brighton maintained that these alleged design and construction flaws allowed excessive humidity to enter the Stone Arch building, causing the moisture-related damages.  Again, inexplicably and to the detriment of all parties in the Court's view, no effort was made to allocate specific items of damage to specific design or construction flaws.

On April 27, 2005, the arbitration panel issued its Interim Award (the "Interim Award").  The Interim Award imposed liability on NewMech for damages incurred at the Stone Arch building based on theories of negligence and breach of contract.  The answers to Questions 31 through 35 of the Interim Award establish that NewMech's design of the HVAC system at Stone Arch was negligent and a direct cause of damages.  The answers to Questions 35 through 38 establish that NewMech's installation or construction of the HVAC system was also negligent and a direct cause of damages.  Significantly, the parties did not ask the arbitrators to determine the specific dollar amounts to be awarded for and against the respective parties and which of the various legal theories justified the award.

---

[2]     At oral argument, the Court inquired as to why neither party requested a transcript.  Other than suggesting that the cost of ordering a transcript was a factor, the parties offered no plausible explanation.

Thus, the arbitrators made no findings regarding what amount, if any, NewMech is required to pay Brighton and KA as a result of design errors versus construction errors.

The arbitrators next allocated fault among the parties. The arbitrators determined that NewMech's negligent design and construction of the HVAC system accounted for 74.86% of Brighton's damages, which were set at $2,659,444. The arbitrators further determined that NewMech's negligent design and construction of the HVAC system accounted for 55.07% of KA's damages, which the arbitrators found to be $2,381,079.

Regarding the Washburn dispute, the arbitrators found that NewMech's design of the HVAC system there, although negligent, was not a cause of damages. The arbitrators found that NewMech had performed $54,135 worth of change-order work at Washburn for which it had not been paid and had incurred extra expenses due to delays caused by Brighton totaling $200,000. The arbitrators therefore ordered KA to pay NewMech $254,135. However, KA and NewMech had a side agreement (the "side agreement") under which KA was only required to pay $125,000 of whatever the arbitrators awarded to NewMech on this claim.

The arbitrators awarded Brighton net damages of $1,603,914 from KA. This amount represents Brighton's damages at Stone Arch, less the contract amounts it owed KA on Washburn. The arbitrators awarded KA net damages of $3,255,378 from NewMech. This amount included KA's own damages and what KA owed Brighton.

On August 1, 2005, the panel issued a Final Award (the "Final Award"). In the Final Award, the arbitrators declined invitations to modify the Interim Award and allocated

7

attorney fees and costs of the arbitration among the parties.  The Final Award directed

NewMech to reimburse KA $550,000 for attorney fees and costs that KA had incurred to

defend itself against allegations of NewMech's fault.  But the arbitrators did not award KA

attorney fees that KA incurred to defend its own work.

The Final Award also allocated expenses of the arbitration to the parties in

proportion to their fault.  Pursuant to that method of allocation, the Final Award directed

NewMech to pay KA $149,088.41.  Additionally, the arbitrators awarded prejudgment

interest at a rate of 5%.  Pursuant to that interest rate, the Final Award directed NewMech

to pay KA $422,753.20.

### Subsequent Proceedings

KA moved to confirm the Final Award in Hennepin County District Court.

NewMech moved to vacate the Stone Arch arbitration award.  In an order dated November

30, 2005, the court granted KA's motion to confirm the arbitration award and denied

NewMech's motion to vacate.  Judgment on the court's order was entered December 15,

2005.  The court subsequently issued a clarification of its ruling, stating that NewMech was

required to pay KA $3,255,378 as the principal arbitration award, $475,819.58 in interest,

$550,000 as attorney fees and costs, $149,088.41 in arbitration costs and $11,874.24 in

interest on attorney fees and arbitration costs.  The Court deducted $125,000 from the net

award pursuant to KA and NewMech's side agreement.  Thus, the court stated that the total

Stone Arch award and judgment against NewMech was $4,317,160.23.  NewMech appealed

the decision to the Minnesota Court of Appeals, where the matter remains pending.

If the Minnesota Court of Appeals affirms the judgment, NewMech requests that this Court grant summary judgment on its claims that Transportation and Continental are required to indemnify it for the entire Stone Arch judgment. Alternatively, NewMech contends that Transportation and Continental are estopped from raising coverage defenses regarding the Stone Arch award and that Transportation is liable for the entire Stone Arch award because it allegedly failed to settle the claim in bad faith. Additionally, NewMech seeks summary judgment on its claim that Transportation is required to reimburse it for its defense costs incurred in the Washburn dispute.

## Discussion

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The

nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Interpretation of the Transportation Insurance Policy

The parties agree that the Court should apply Minnesota law. When construing insurance contracts, a court applies general principles of contract interpretation in construing insurance contracts. *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). The correct interpretation of a clause in an insurance policy is a question of law. *Haarstad v. Graff*, 517 N.W.2d 582, 584 (Minn. 1994). Words in insurance contacts are given their plain and ordinary meaning. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). A court must consider the policy and its exclusions as a whole, and "the terms will not be so strictly construed as to lead to a harsh or absurd result." *Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 165 N.W.2d 554, 556 (Minn. 1969). Any ambiguity in the language of an insurance policy must be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 35 (Minn. 1979). The insured has the initial burden of proof to establish a prima facie case of coverage. *SCSC Corp. v. Allied Mut. Ins.  Co.*, 536 N.W.2d 305, 311 (Minn. 1995). What constitutes a prima facie showing of coverage depends on the policy's language. *Id.*

NewMech asserts that Transportation must pay its policy limits of $3 million toward the Stone Arch judgment as a matter of contract interpretation.  In support of this assertion, NewMech makes several arguments.  First, NewMech contends that the Stone Arch damage award is covered under the Design Services Endorsement and that the aggregate limit of $2 million applies.  Second, NewMech contends that the CGL Form provides additional coverage for the Stone Arch award to the extent of the form's $1 million per occurrence limits.  Third, NewMech contends that the Design Services Liability Endorsement's limits and the CGL Form's limits are additive.  Finally, NewMech contends that Transportation may not collaterally attack the arbitration award.  The Court will address each argument in turn.

### A.      Liability Under the Design Services Endorsement

The Design Services Endorsement states that:

a.      [Transportation] will pay those sums that the insured becomes legally obligated to pay as damages arising out of any "wrongful act" committed by the insured to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "wrongful act" and settle any claim or "suit" that my result.  But:

(1)      The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (CLAUSE C) of this endorsement; and

(2)      Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this endorsement.

(Simpson Aff., Ex. 1 at 8.)  The Design Services Endorsement defines "Wrongful Act" as "a

negligent act, error, or omission by the insured arising out of the performance or failure to perform 'Design Services.'"  (*Id.* at 14.)  "Design Services" means "the preparing, approving, or failing to prepare or approve maps, drawings, opinions, plans, reports, analyses, surveys, change orders, designs or specifications, inspection and engineering services that the insured is qualified to perform for others in the capacity as described in the Design Services Liability Coverage Supplementary Schedule."  (*Id.*)

The arbitrators found that NewMech was "negligent in the performance of its design function with respect to the HVAC system at Stone Arch Lofts." (Simpson Aff., Ex. 10 at 16.)  NewMech points out that it was alleged to have made several design errors in the Stone Arch arbitration, including:  (1) that NewMech should have installed a tempered make-up air system in the Stone Arch building; (2) that a design error in equipment selection resulted in installed mechanical cooling systems; and (3) that its design was unsuitable because the fan coils it provided were too noisy.  Thus, NewMech asserts that it has satisfied the Design Services Endorsement's requirement that liability be premised on a "wrongful act."  At oral argument, Transportation admitted that NewMech had satisfied this showing of coverage. (Tr. at 73, 81.)  Thus, the Court will address NewMech's assertion that the aggregate limit of $2 million applies.

NewMech asserts that the Design Services Endorsement does not include language suggesting that related design errors, or errors made within a single construction project, should be deemed a single "wrongful act."  Thus, NewMech contends that the aggregate limit of $2 million applies because it was alleged to have made several different design

errors (no make-up air, insufficient cooling capacity, improper selection of fan coils).

Transportation, on the other hand, asserts that NewMech is not entitled to the aggregate

limit of liability under the Design Services Endorsement because the allegations in the

underlying arbitration arose out of the overall alleged design failure for the single project at

Stone Arch.  Transportation contends that the various components of the design listed by

NewMech all flow from the original drawings and specifications that NewMech's engineer

signed-off on in March 2000.

The Court finds that the aggregate limit of $2 million applies.  The plain,

unambiguous definition of "wrongful act" indicates that a singular negligent act, error, or

omission constitutes a "wrongful act."  (Simpson Aff., Ex. 1 at 14.)  The Design Services

Endorsement does not include language suggesting that related design errors, or errors

made within a single construction project, should be deemed a single "wrongful act."

Furthermore, the "Limits of Insurance" section also supports this interpretation.  That

section states that "[t]he Each "Wrongful Act" Limit shown in the Design Services Liability

Coverage Supplemental Schedule is the most we will pay for all damages arising out of any

*one* "wrongful act."'  (*Id.* at 12 (emphasis added).)  Thus, this language indicates that the

contract contemplated that a singular act constitutes a "wrongful act."

The Court rejects Transportation's assertion that such an interpretation artificially

broadens the available coverage.  Here, the policy caps the aggregate limit at $2 million.

Specifically, the "Limits of Insurance" section states, "[t]he aggregate Limit shown in the

Design Services Liability Coverage Supplemental Schedule is the most we will pay for the

13

sum of damages for all claims or 'suits' to which this insurance applies." (*Id.*)  Thus, regardless of the number of alleged "wrongful acts," the insurer will only pay for two such "wrongful acts."  Because NewMech was alleged to have made three design errors, the Design Services Endorsement's aggregate limit is applicable.

### B.   Liability Under the CGL

The CGL Form promises to pay "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (Simpson Aff., Ex. 1 at 18.)  The form requires the insurer to pay all damages causally related to an item of "property damage" under the form's definitions.  (Pl.'s Mem. in Supp. of Summ. J. at 26.)[3]  The form also stipulates that it applies only if the property damage is caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*)

NewMech contends that at the arbitration Brighton and KA argued that NewMech was negligent because it failed to balance the HVAC systems, failed to properly rebalance aspects of its system that it did balance, failed to dry the building out once the humidity was discovered, failed to properly adjust the toilet exhaust system, improperly installed the

---

[3]     The Court cites to NewMech's brief, rather than the CGL policy itself, because NewMech does not cite the policy here.  This may be because Transportation was unable to produce a complete and certified copy of the policy.  As a result, Exhibit 1 consists of what NewMech believes to be the material forms that comprise the CGL policy that Transportation issued to NewMech for the period October 1, 2000, to October 1, 2001. (Simpson Aff., ¶ 1, Ex. 1.)  Transportation does not appear to refute NewMech's initial characterization of the CGL policy.

dryer exhaust system, improperly installed fan coils and dryer exhaust duct work, and installed undersized fan coils. NewMech contends that, based on the evidence supporting these arguments, the arbitrators found that NewMech was negligent "in the installation or construction of the HVAC system at Stone Arch Lofts." (Simpson Aff., Ex. 10 at 16.) Thus, according to NewMech, this finding satisfies the CGL Form's requirement that liability be premised on an "occurrence" and thereby entitles NewMech to the extent of the form's $1 million per occurrence limits.

In response, Transportation asserts that the CGL Form contains an express exclusion for professional services. Thus, according to Transportation, if there is a finding of coverage under the Design Services Endorsement for the Stone Arch claim, the CGL Form does not afford coverage. Additionally, Transportation contends that although the arbitration panel found that NewMech was negligent in the performance of its design function and also was negligent in its installation or construction of the HVAC system, there is a genuine issue of material fact regarding where, if at all, damage from NewMech's defective design ended and damage from its alleged construction activities began. Transportation also contends that there may not have been an "occurrence" of "property damage" as defined under the policy, which would preclude coverage. Finally, Transportation alleges that coverage should be barred under the expected or intended injury exclusion, the contract exclusion, and the business risk exclusion.

The Court rejects Transportation's assertion that the professional services exclusion bars coverage. That exclusion provides, "This insurance does not apply to 'bodily injury',

'property damage' or 'personal and advertising injury' arising out of the rendering of or failure to render any professional services by you or on your behalf[.]" (Simpson Aff., Ex. 1 at 54.)  The exclusion provides that "professional services" include:

    a.    Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b.    Supervisory or inspection activities performed as part of any related architectural or engineering activities.

(*Id.*)  However, the exclusion further provides that "Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor."  (*Id.*)  Thus, because the professional services here included services within construction means that were performed in NewMech's capacity as a construction contractor, the exclusion is inapplicable.

      The Court also rejects Transportation's assertion that there may not have been an "occurrence" of "property damage" because Transportation has provided no evidence to support this claim.  Additionally, the Court finds no merit in Transportation's citation to a number of policy exclusions because Transportation has produced no evidence that any of these exclusions apply.  Thus, Transportation has failed to show that there is a genuine issue of material fact as to whether there was an occurrence of property damage at Stone Arch or as to the application of any of the cited policy exclusions.  Accordingly, the Court finds that NewMech has met its burden of showing that it is entitled to coverage for "property

16

damage" under the CGL Form.  Although NewMech has shown that it is entitled to coverage under the CGL Form, a genuine issue of material fact exists as to the amount of damages to which NewMech is entitled.  Specifically, a genuine issue of material fact exists regarding where damage from NewMech's negligent design ended and damage from its negligent construction activities began.  Thus, the Court finds that summary judgment is not appropriate.

**C.     Whether the Design Services Endorsement's Limits Add to the CGL Form's Limits**

NewMech asserts that the Design Services Endorsement's limits and the CGL Form's limits are additive.  NewMech admits that the Design Service Endorsement's "limits of insurance" clause states that the "Each Wrongful Act" limit "is the most we will pay for the sum of damages for all claims or "suits" to which this insurance applies.  (Simpson Aff., Ex. 1 at 12–13.)  But NewMech points out that this clause appears after the following preamble:  "The following provisions of this endorsement apply only as respects [sic] Design Services Liability Coverage Endorsement."  (Simpson Aff., Ex. 1 at 8.)  Therefore, according to NewMech, the limits apply only to coverage under the Design Services Endorsement and do not affect or substitute for the limits available under the CGL Form.  Thus, NewMech contends that the Design Service Endorsement's available limits may be added to the CGL Form's $1 million per occurrence limit.

Transportation, on the other hand, contends that the Design Services Endorsement and the CGL Form are mutually exclusive.  Transportation asserts that Brighton's and KA's

17

respective allegations in the underlying arbitration arose out of the negligent design of the Stone Arch project's HVAC system and that NewMech fails to provide any support for its argument that the policy provides two separate limits for this one claim.

Here, Transportation does not cite any language in the policy to support its position that the Design Services Endorsement's and the CGL Form's limits are mutually exclusive. Thus, the Court declines to read such a limitation into the policy. Therefore, the Court finds that Design Service Endorsement's available limits may be added to the CGL Form's limits.

**D.     Collateral Attack on Arbitration Award**

NewMech contends that Transportation may not collaterally attack the arbitration award. In particular, NewMech contends that Transportation may not relitigate the basis for the arbitration award in order to avoid coverage. In response, Transportation asserts that it "is not interested in challenging the amount awarded in the underlying arbitration or arguing about whether there was a lack of causal connection between NewMech's work and the damages awarded before this Court." (Defs.' Opp'n Mem. at 20.) But Transportation asserts that it has a right to challenge whether the arbitration award is covered under the policy and reserved this right in its reservation of rights letter. Here, there is no evidence that Transportation is attempting to relitigate the basis for the arbitration award. Thus, this is a moot issue.

In conclusion, the Court has found that NewMech has satisfied the Design Services Endorsement's requirement that liability be premised on a "wrongful act." The Court also

found that the aggregate limit is applicable.  Next, the Court determined that NewMech has

demonstrated that it is entitled to coverage for "property damage" under the CGL.  Finally,

the Court determined that the Design Services Endorsement's limits may be added to the

CGL Form's limits.  Although NewMech has shown that it is entitled to coverage under the

Design Services Endorsement and the CGL Form, it has not satisfied its burden of proof to

demonstrate a prima facie case of coverage.

Because the arbitrators did not make findings of fact regarding the amount of

damages that NewMech's negligent design caused as opposed to its negligent construction,

NewMech cannot establish which insurance provision covers what part of the award, if any.

Thus, NewMech is not entitled to summary judgment on this claim.  The Court orders the

parties to submit supplemental briefs within two weeks of

this Order that address the Court's authority to remand this case to the AAA for the limited

purpose of making findings of fact regarding the specific dollar amount of NewMech's

liability for its negligent design of the HVAC system at Stone Arch and the specific amount,

if any, of its negligent installation or construction of the HVAC system at Stone Arch.

## III.    Whether Transportation is Estopped From Denying Coverage

Alternatively, NewMech asserts that the doctrine of estoppel bars Transportation

from denying coverage for the Stone Arch award.  Under Minnesota law, estoppel is an

equitable doctrine within the court's discretion and is intended to prevent a party from

taking unconscionable advantage of its own wrong by asserting its strict legal rights.

*Plymouth Foam Products v. City of Becker, Minnesota*, 120 F.3d 153, 156 (8th Cir.

1997).  Under Minnesota law, equitable estoppel may be asserted where (1) there has been

a misrepresentation of material fact; (2) the party to be estopped knew or should have

known that the representation was false; (3) the party to be estopped intended the

representation to be acted upon; (4) the party asserting equitable estoppel lacked the

knowledge of the true facts; and (5) the party asserting the estoppel did, in fact, rely upon

the misrepresentation to its detriment.  *Transamerica Ins. Co. v. IBC*, 94 F.3d 1204, 1208–

09 (8th Cir. 1996).  Facts giving rise to equitable estoppel need be proved only by a fair

preponderance of the evidence, but the facts themselves must be clear, positive and

unequivocal in their implication.  *Eliason v. Production Credit Ass'n of Aitkin*, 106

N.W.2d 210, 212–13 (1960).  When the facts are such that only one inference may be

drawn, the application of estoppel becomes a question of law for the court to decide.  *L & H

Transp., Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 227 (Minn. 1987).

The Minnesota Supreme Court has held that estoppel cannot be used to expand or

create insurance coverage where it does not exist.  *Shannon v. Great Am. Ins. Co.*, 276

N.W.2d 77, 78 (Minn. 1979).  A limited exception to this rule exists, however, which

permits the use of estoppel by an insured to actually create coverage where the insurer

controls the litigation by the insured.  *Tozer v. Ocean Accident & Guar. Corp.*, 94 Minn.

478, 103 N.W. 509, 511 (Minn. 1905).  The doctrine of estoppel operates in such a

circumstance to prevent an insured from being left in the untenable position of having no

voice in the litigation where the insurer is defending its own interests, not those of the

insured.  *Patterson v. Adan*, 119 Minn. 308, 138 N.W. 281, 283 (1912).

"Assumption-of-defense estoppel is narrowly applied, however, and is not applicable where the insurer has refused the defense of the insured, *Globe Indem. Co. v. Hansen*, 231 F.2d 895, 906 (8th Cir. 1956); where the insurer gives a notice of a reservation of rights, *Faber v. Roelofs*, 311 Minn. 428, 250 N.W.2d 817, 821 (1977); or where the insurer does not conduct the defense with knowledge of the relevant facts, *Humphrey v. Polski*, 161 Minn. 61, 200 N.W. 812, 812 (1924)." *Minnesota Commercial Railway Co., v. General Star Indem. Co.*, 408 F.3d 1061, 1064 (D. Minn. 2005).

NewMech asserts that Transportation is estopped from denying coverage for the Stone Arch award on the basis that it defended the underlying action without raising coverage defenses. NewMech contends that although Transportation issued a reservation-of-rights letter at the inception of the arbitration, the letter does not mention the Design Services Endorsement. Thus, according to NewMech, Transportation did not reserve any rights under the Design Services Endorsement. NewMech also asserts that had Transportation advised NewMech of any uninsured exposure, NewMech could have protected itself by offering its own money to help settle the case.

Transportation, on the other hand, asserts that NewMech's argument fails because Transportation issued a reservation of rights letter on January 10, 2003. Further, NewMech contends that the fact that Transportation's letter does not reference the Design Services Endorsement is inconsequential because NewMech knew there was a possibility of no coverage under the policy given that the reservation of rights letter included the right to later deny coverage.

The Court finds that NewMech is not entitled to the use of the doctrine of estoppel to expand its coverage under its policy because Transportation reserved its rights under the policy by issuing a reservation of rights letter.  Transportation's letter specifically reserved the right to dispute issues of coverage and to deny coverage for defense or indemnity at any time.  Additionally, the letter also stated that Transportation's participation in NewMech's defense did not require it to make any settlement offers or satisfy any judgments on behalf of NewMech for claims not covered by the policy and that NewMech might be required to contribute toward uncovered damages.  Furthermore, NewMech was represented by counsel who participated in the arbitration and who were aware of the settlement discussions that occurred.  Thus, the Court finds that NewMech is not entitled to summary judgment on its claim that Transportation is estopped from denying coverage.

## IV.     Bad Faith

Under Minnesota law, a liability insurer, after taking control of settlement decisions for claims against its insured, may become liable in excess of its undertaking under the terms of the policy if it fails to exercise "good faith" in considering offers to settle the claim for an amount within the policy limits.  *Short v. Dairyland Ins. Co.*, 334 N.W.2d 384, 387 (Minn. 1983); *Iowa Nat'l Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 371 N.W.2d 627, 628 (Minn. Ct. App. 1985).  An insurer may breach its duty of good faith if the insured is clearly liable, the insurer refuses to settle within the policy limits, and the decision not to settle within the policy limits is made in bad faith and is not based upon reasonable grounds to believe that the amount demanded is excessive.  *Iowa Nat'l Mut. Ins. Co.*, 371 N.W.2d at

628.  In order to establish a bad-faith failure-to-settle claim under Minnesota law, it must

be shown that the claimant gave the insurer a settlement demand that was within the policy

limits.  *See e.g., Short*, 334 N.W.2d at 388.  No claim for breach of the duty to settle lies

where the record establishes that the insurer accused of bad faith was never presented with a

demand to settle within the policy limits.  *See Iowa Nat'l*, 371 N.W.2d at 628.

NewMech contends that Transportation is liable for the entire $4.4 million Stone

Arch award because, according to NewMech, Transportation's failure to settle was in bad

faith.  In particular, NewMech asserts that Transportation controlled NewMech's defense

and settlement negotiations, knew that NewMech would be found liable, and declined

opportunities to settle the case within policy limits.  In response, Transportation asserts that

NewMech is not entitled to summary judgment because genuine issues of material fact

exist.  The Court agrees.

First, fact issues remain regarding whether Transportation was presented with a

settlement demand within its policy limits.  NewMech seems to agree that Transportation

did not receive a settlement demand that triggered an obligation to settle.  In its principal

brief, NewMech admits that "the negotiations never advanced to the point that a clear

written demand was issued to NewMech for a sum of money that would relieve it of

liability."  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 32.)  But NewMech alleges that

"[t]he reason settlement negotiations did not progress was that the insurer for the party who

everybody recognized was most at fault refused to offer anything to resolve the claims

against its insured."  (*Id.*)  Thus, NewMech has not demonstrated that, as a matter of law,

23

Transportation was presented with a settlement demand within its policy limits.

Furthermore, fact issues remain regarding whether Transportation controlled NewMech's defense.  For example, Gerald Duffy, NewMech's personal counsel, admitted in his deposition that Transportation was not controlling the defense.  (Aff. of Matthew R. Wildermuth in Supp. of Transportation's and Continental's Response to NewMech's Mot. for Summ. J. ("Wildermuth Aff.") ¶ 6, Ex. 6 at 5, 8.)  Rather, Duffy explained that he and defense counsel, Jim Haigh, were collaborating in the representation of NewMech.  (*Id.*) Additionally, fact issues remain regarding whether Transportation knew that NewMech would be found liable.  The fact that Transportation wrote several internal reports indicating that NewMech's liability was "probable" does not mean that Transportation was clearly liable.  (Pl.'s Mem. in Supp. of Summ. J. at 31.) On the record before the Court, NewMech is not entitled to summary judgment on its bad-faith failure-to-settle claim.

## V.     Duty to Defend

An insurer's duty to defend is distinct from and broader than the duty to indemnify. *Franklin v. Western Nat'l Mut. Ins. Co.*, 574 N.W.2d 405, 406 (Minn. 1998).  An insurer's duty to defend an insured is contractual.  *Meadowbrook, Inc. v. Tower Ins. Co., Inc.*, 559 N.W.2d 411, 415 (Minn. 1997).  The duty to defend covers those claims that arguably fall within the scope of the insurance policy.  *Id.*  An insurer's duty to defend is determined by comparing the allegations in the complaint with the relevant policy language.  *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390 (Minn. 1979).  However, the complaint is not controlling if extrinsic facts clarify the true nature of the underlying claims.  *Johnson v.*

*AID Ins. Co.*, 287 N.W.2d 663, 665 (Minn. 1980). Thus, "once the insured comes forward with facts showing arguable coverage, or the insurer becomes independently aware of such facts, the insurer must either defend or further investigate the potential claim." *SCSC*, 536 N.W.2d at 316. The insurer bears the burden of showing that it has no duty to defend. *Id.*

NewMech contends that Transportation must reimburse it for its defense in the Washburn dispute because such losses were alleged to result from covered property damage at Stone Arch. NewMech admits that KA's complaint against NewMech regarding Washburn did not state an affirmative claim for relief and instead merely added NewMech as a necessary party because NewMech had not been paid for its work at Washburn. But NewMech contends that Brighton posited a theory that it was entitled to damages from Washburn that were caused by the workmanship issues at Stone Arch and that this theory is evident from the AAA's Order for Consolidation. In that Order, issued May 21, 2003, the AAA stated:

> In reading the parties' submissions filed with respect to issues concerning consolidation and joinder it is the undersigned's conclusion that if the problems of high humidity, negative HVAC pressure, mold, and sound attenuation had not occurred on the Stone Arch project, the size and scope of the Washburn dispute would be greatly diminished, if not resolved, by ordinary negotiations between sophisticated parties. It is abundantly clear that in a "real world" causative sense, the problems from Stone Arch either caused or materially contributed to the problems arising from completion of the Washburn project and Brighton's withholding of payment.

> In short, the problems encountered on the Stone Arch project caused some of the damages related to the Washburn project and certainly increased the amount of the damages claimed.

(Simpson Aff., Ex. 6 at 2.)

In response, Transportation asserts that it owes no duty to reimburse NewMech for defense costs incurred in the Washburn matter because the Washburn claims sound in contract and are not covered under the Transportation policy.  The Court agrees. NewMech does not dispute that KA's complaint against NewMech regarding Washburn did not state an affirmative claim for relief and thereby failed to trigger a duty to defend.  Instead, NewMech cites the Order for Consolidation as extrinsic evidence showing arguable coverage.  But NewMech's reliance on the Order for Consolidation is misplaced.

In that Order, the AAA stated, "It is abundantly clear that in a 'real world' causative sense, the problems from Stone Arch either caused or materially contributed to *the problems arising from the completion of the Washburn project and Brighton's withholding of payment*."  (*Id.* (emphasis added).)  The AAA merely highlighted the fact that in the Washburn matter, KA asserted that Brighton had not paid it contract amounts due for work done at Washburn.  Thus, this language reflects that the claims in the Washburn matter were contractual.  This language does not resolve any issues of legal causation. Instead, the AAA merely addressed whether the arbitrations should be consolidated for administrative purposes.  Therefore, the Court rejects NewMech's reliance on the Order for Consolidation as extrinsic evidence that shows arguable coverage under the policy. Accordingly, the Court denies NewMech's motion for summary judgment on Transportation's duty to reimburse it for costs incurred in the Washburn matter.

## VI.    Interpretation of the Continental Insurance Policy

NewMech asserts that Continental, as NewMech's umbrella insurer, must pay any

portion of the Stone Arch damage award and judgment that exceeds the primary policy limits. NewMech specifically asserts that the Continental policy applies to the Stone Arch claims because there was an occurrence of property damage that triggered the primary Transportation policy. In response, Transportation asserts that Continental has no obligation to indemnify NewMech before there is a determination of coverage and exhaustion of the underlying insurance. Transportation contends that the Continental policy does not cover professional services. (Simpson Aff., Ex. 2 at 25.) Thus, according to Transportation, if it is determined that the Stone Arch judgment implicates the Design Services Endorsement, but not the CGL Form, then there should also be a finding of no coverage under the Continental policy.

The Continental policy provides that Continental shall only be liable for "ultimate net loss" in excess of the applicable limits of the "scheduled underlying insurances" for "incidents" covered by the "scheduled underlying insurances." (Simpson Aff., Ex. 2 at 13.) The schedule lists the Transportation CGL policy as underlying insurance. (*Id.* at 3.) "'Ultimate net loss' means the actual damages the insured is legally obligated to pay [through] final adjudication on the merits . . . because of 'incident(s)' covered by this policy." (*Id.* at 19.)

The underlying Transportation policy has not yet been exhausted because, as discussed above, a genuine issue of material fact exists regarding the amount that NewMech's negligent design and construction each caused, if any. The amount of damages awarded in the Stone Arch matter that are afforded coverage under the Transportation policy

have not been determined.  Only after the coverage issues under the Transportation policy are determined and only if the limit of the Transportation policy is exhausted, must there be a determination of coverage under the Continental policy.  Accordingly, the Court rejects NewMech's claim as premature.

## VII.    Whether Continental is Estopped from Denying Coverage

NewMech contends that Continental is estopped from disclaiming coverage because Continental failed to reserve its rights.  Specifically, NewMech asserts that Continental defended NewMech because Continental's claims adjuster was Ron Chamberlain, the person who controlled NewMech's defense, and that Continental failed to issue a reservation of rights letter.  Transportation, however, asserts that Continental is not estopped from disclaiming coverage because Continental did not control NewMech's defense in the Stone Arch dispute.  The Court agrees.

As stated above, under Minnesota law, an insurer that refuses coverage and did not control the defense of the insured is not estopped from denying coverage. *Gen. Star*, 408 F.3d at 1064.  Here, Continental did not participate in or control NewMech's defense in the underlying matter.  Rather, Transportation defended NewMech in the underlying matter. Thus, Continental is not estopped from asserting coverage defenses, and NewMech is not entitled to summary judgment on this claim.

## Conclusion

The Court is troubled by this case because it was entirely avoidable.  The parties are all responsible for the failure to request that the arbitrators make findings of fact regarding where, if at all, damages from NewMech's defective design ended and damage from its construction errors began.  The Court agrees with Transportation that, "had the [Final Award] made an express finding based on the evidence, that NewMech is liable for a dollar-specific amount of damage to the property of others based on its breach of its design and a separate amount of damages in respect [to] third-party property based on defective construction, the Insurers would be hard-pressed to contest such an allocation."  (Defs.' Opp'n Mem. at 14.)  Furthermore, the Court is troubled that there is no transcript or recording of the arbitration proceedings.  The Court believes that it is in the best interests of the parties to settle this case.  If the parties would like the Court's assistance in pursuing a settlement, they may contact Magistrate Judge Susan Richard Nelson's chambers at 612 664-5490 in order to schedule a conference.

**Accordingly, IT IS HEREBY ORDERED THAT:**

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 36) is **DENIED**.

2.      The parties are ordered to submit supplemental briefs not longer than ten (10) pages within two weeks of this Order that address the Court's authority to remand this case to the AAA for the limited purpose of making findings of fact regarding the specific dollar amount of NewMech's liability for its negligent design of the HVAC system at Stone Arch and the specific amount, if any, of its negligent installation or construction of the

HVAC system at Stone Arch.


Dated:  September 12, 2006        <u>s/Donovan W. Frank</u>
                                       DONOVAN W. FRANK
                                       Judge of United States District Court